Maria Soto **DE LEGRAND** and **Miguel Angel Legrand, Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 8744.

United States District Court
D. Puerto Rico.

Francisco Ponsa Feliu, Luis Blanco Lugo, and German Rieckehoff, San Juan, Puerto Rico, for plaintiffs.

Francisco A. Gil, Jr., U. S. Atty., San Juan, Puerto Rico, for defendant.

DELEHANT, District Judge (Retired, serving by assignment).

In this action, instituted here under the Federal Tort Claims Act, Title 28 U.S.C. §§ 1346, and 2671 to 2680, inclusive, the plaintiffs join, through a single complaint, in separate demands for judgment against defendant in the sum of $25,000 in behalf of each plaintiff, together with costs. Plaintiff, Maria Soto de Legrand, sues as the mother of Jesus Legrand Soto, deceased, who, being a minor infra, died on March 21, 1953, for damages to her allegedly resulting from his death. Plaintiff, Miguel Angel Legrand, in his own right, sues for damages to him allegedly resulting from personal injuries sustained by him. The claim of each plaintiff is based upon personal injuries, fatal in their consequence to Jesus Legrand Soto, and to plaintiff, Miguel Angel Legrand, painful, expensive, and disabling, by such persons respectively received on March 20, 1953, as direct results of the explosion of "an explosive contrivance or device" allegedly left and abandoned negligently and wrongfully by the defendant on lands within the United States Naval Reservation in Vieques, Puerto Rico. The defendant admits the occurrence on March 20, 1953, on lands within such reservation of an explosion, and the death of March 21, 1953, in consequence of the explosion, of Jesus Legrand Soto; but it denies all other averments of the complaint, and particularly those charging it with negligence; and, further, alleges that the explosion was caused solely, exclusively and proximately by the fault and negligence of Jesus Legrand Soto and Miguel Angel Legrand, which fault and negligence of Jesus Legrand Soto and Miguel Angel Legrand are also charged by defendant to have constituted contributory negligence. And defendant also avers that the explosion was "fortuitous" and thus beyond its legal responsibility.

The issues are set out in the complaint and the answer, each of which is brief. Because of their brevity, and with omission in each instance of caption and signature, they are reflected herein in full, the complaint as one footnote [1], the an-

---

1. The complaint, with the omission of its caption and signature follows:
 "Complaint
 "1—Plaintiff Maria Soto de Legrand was on March 3, 1953 the legitimate mother of her minor son Jesus Legrand Soto who on said date died was a result of the accident described hereinbelow in paragraph 2.
 "2—On an *ocassion* prior to March 3, 1953, the exact date being unknown to plaintiffs, employees of the defendant, while acting within the scope of their employment, negligently and wrongfully left and abandoned on lands within the United States Navy Reservation, in Vieques, Puerto Rico, an explosive contrivance or device the exact nature of which is unknown to plaintiffs at this time, which exploded upon being accidentally kicked by the said Jesus Legrand Soto while he was walking on said lands accompanied by co-defendant Miguel Angel Legrand.

swer as another [2]. Attention is now directed to the disparity touching the dates of the explosion and of the death of Jesus Legrand Soto, as between the two pleadings. The court, without again referring to that discrepancy, will undertake correctly to reflect those dates in its findings of fact. It is sufficient to observe that the discrepancy in the pleadings has occasioned no practical problem in the submission of the action.

Trial has been had, evidence and testimony, both oral and documentary, have been received, and typewritten briefs of counsel have been presented and filed. All of these, and the original files, have had the court's consideration; and the case is ready for decision. The facts, as found by the court, are first set out.

Vieques is situated in the sea about eight miles distant easterly from the main body of the island of Puerto Rico.

"3.—As a result of the accident described in the preceeding paragraph, which was caused solely and exclusively by the negligence and wrongful acts of defendant, as aforesaid, plaintiffs suffered the following damages:

"A—Plaintiff Maria Soto de Legrand suffered the irreparable loss of her minor son, has suffered great mental pain and anguish, incurred in funeral expenses and has suffered damages in the amount of $25,000.00

"B—Plaintiff Miguel Angel Legrand suffered very serious bodily injuries, is permanently incapacitated of one arm and one leg, is now unable to work and has suffered great physical and mental pain and anguish, all of which damages he estimates in the amount of $25,000.00

"4—Plaintiffs, and each one of them, demand judgment against defendant in the amount of $25,000.00 for each plaintiff plus costs and attorneys' fees."

2. The answer, with the omission of its caption and signature, follows:

"Answer

"1—Answering paragraph 1 of the complaint, defendant admits that Jesus Legrand Soto died on March 21, 1953 as a result of the accident described hereinbelow in paragraph 2. Defendant is without knowledge or information to form a belief as to each and every other allegation contained in paragraph 1, and therefore denies them.

"2—Answering paragraph 2 of the complaint, defendant admits that on March

Vieques is itself a separate island. While it is irregular in its shape and shore line, it has maximal dimensions of about 21 miles in length and 6 miles in width; and its longer dimension is in a generally east-west direction. However, its easterly extremity lies farther north than its westerly segment. Southerly from it is the Caribbean Sea, and to its north are segments of water related to the ocean. For governmental purposes, it is a part of Puerto Rico. Therefore, its local laws are those of the Commonwealth. It has, however, its own local urban organization, of which the head is an officer designated as its mayor, whose official authority is considered from his testimony to extend throughout the island, which is thus treated as a municipality regardless of its generally rural character.

Located about midway between the easterly and westerly terminal of Vi-

20, 1953 a certain explosion occurred on lands within the United States Naval Reservation at Vieques. Defendant denies each and every other allegation contained therein.

"3.—Defendant denies the allegations contained in paragraphs 3, 3A and 3B of the complaint.

"Affirmative Defenses

"1

"The accident alleged in the complaint which resulted in the death of Jesus Legrand Soto and caused injuries to coplaintiff Miguel Angel Legrand, was caused solely and exclusively and had at its proximate cause the fault and negligence of said Jesus Legrand Soto and of said Miguel Angel Legrand.

"11

"Assuming negligence on the part of any employee of the defendant, plaintiffs are precluded from recovery herein because said Miguel Angel Legrand and said Jesus Legrand Soto were guilty of contributory negligence which directly contributed to the proximate cause of the accident.

"III

"The accident which caused the death of Jesus Legrand Soto and injuries to Miguel Angel Legrand was fortuitous, for which defendant may not be held liable.

"Wherefore defendant prays that the complaint be dismissed, with costs to the plaintiffs."

eques, and near to its northerly side are two neighboring settlements to which have been given the names "Santa Maria" and "Moscou," of which the former is somewhat the larger and lies slightly north and east of the latter. From the evidence it appears, and is found, that the boundaries of these two settlements are not clearly defined and that they are actually regarded as one community. But on maps of the island they are separately designated, though without definition of their boundaries. The population of each such settlement may not be found from the evidence, except that an informed witness declared that about 800 persons lived in the area of Moscou, although he may have meant in that estimate to include the population of both Moscou and Santa Maria.

Traditionally, Vieques was rural in character. The principal industry was agriculture, and its prime crop was sugar cane. But in substantial numbers, cattle were raised and kept on the island. These were not maintained for ranching, or, as an enterprise of any considerable magnitude, for commercial or speculative, purposes. With possible exceptions [3], they were kept for domestic use, and to support the food supply of families of modest means, especially those of the men employed in the sugar cane growing industry.

About ten or twelve years before the incident out of which this suit arose, the government of the United States initiated a program involving the acquisition of land for military and naval purposes on the island. Some time between 1947 and 1949 [4], it carried that program forward through proceedings [5] in the exercise of its right of Eminent Domain. At any rate, with the completion of the condemnation proceedings, and including its acquisitions therein effected, and also its lands theretofore acquired, the United States became, as through 1953 it continued to be, and still is, the owner of approximately 80 percent of the area of the island of Vieques. In general terms, it was disclosed by the evidence that, of the entire land in Vieques, only about 10,000 acres [6], located in a fairly compact portion of the island and in its central section, are not in the ownership of the United States. And of these 10,000 acres, a large, but unestablished, part is owned by the local government or agencies or instrumentalities of it. Only a small part is in strictly private ownership and control. And, even within the 10,000 acre segment, is at least one parcel of slightly more than 500 acres which is owned by the United States, supra.

Generally, and without more exact definition, which upon this record would not be possible, the purpose of the foregoing land acquisition was the provision of the acquired area or areas for training activities under the control of the United States Navy. These training activities included, and largely involved, maneuvers in which personnel were tested and train-

3. And the court does not recall that the evidence discloses any beyond a declaration that there had been some cattle herds.

4. For want of stipulated or record evidence upon the point, the court deems it inappropriate to be more specific touching the date now mentioned. The oral evidence respecting it is imprecise and not entirely consistent. And, actually, that date is only collaterally involved in the case. There was no strict necessity for evidence upon it.

5. Whether a single large proceeding, or many separate but related proceedings, was or were resorted to does not appear. Nor is it presently relevant to the court's study.

6. That figure was indicated in the evidence but only as an approximation. Even in giving it, the witness who mentioned it at once diminished it to 9,500 acres by taking notice of a tract of slightly more than 500 acres within it, which is also owned by the United States. Moreover, it is not possible—and the writer hereof has tried—from the evidence to arrive at any computation which would treat 80 per cent of the island land as property of the United States and 20 per cent of it as owned either by the local government or by private proprietors, and to reach for that 20 per cent a result of 10,000 or 9,500 acres, or any figure relatively near to either of them. But that frustration does not really matter here; and further discussion of it is put aside.

ed, and material and ordnance, inclusive of explosives, were experimented with and tried with a view to their appraisal and selection or rejection or improvement, and also to the development of personnel. In the course of its utilization, relatively frequent, though not constant, maneuvers were held upon portions of the taken lands designated broadly as a "maneuver area."

From the foregoing, resulted an economic and social disorganization of the population of Vieques as it had existed immediately before the land acquisitions by the United States. The purpose of the acquisitions and the ensuing use by the taker of the lands thereby acquired naturally and inevitably eliminated [7] much of the island's land from utilization for the production of crops by intensive cultivation. And this had the consequence of narrowing, if not altogether withdrawing, the avenues of gainful employment theretofore open to the wage earners of the community. It resulted that some of the population sought new homes and means of livelihood [8] elsewhere. But others remained on Vieques, although many of them in homes at places different from their former residences.

Many of the people who remained on the island continued to keep cows in assistance of their food provision efforts. How far this was true is reflected in the testimony on cross examination of the Manager of the Naval Properties division, appearing as a defendant's witness, that in 1952, the year before the occurrence of the incident in suit, 5,554 cattle were grazed on Vieques Navy land. While that figure was questioned on the basis of superficial observation by a later defense witness, the court finds that it is essentially correct, as being disclosed by regularly kept records.

These cattle were by the United States Naval authorities allowed to graze on lands of the island owned by the United States. Permission for such grazing was granted from time to time by the local administrative representatives of the United States Navy. While no formalized agreement or permission in writing is before the court as an item of evidence, it is shown and found that the local residents owning cattle for which grazing privileges were required, were represented in successive negotiations to that end, and at different times, by a voluntary organization of the owners of the cattle and by a legally constituted land or Agricultural Authority with jurisdiction in Vieques, erected in about 1945 or 1946 [9] by the Commonwealth legislature.

When maneuvers were not in progress, or in their preparatory phase, the cattle of the inhabitants of the island were allowed to be pastured on such navy lands suitable for grazing as were not from time to time otherwise needed. And the owners of the animals, or others for them, brought the cattle to, and took them from, the pasture. During the course of maneuvers, by the direction of the local naval authorities, the cattle so being pastured were restricted to grazing within a relatively small area of the island segregated for that purpose and known as "El Corredor." It is located somewhat but slightly easterly from Moscou and Santa Maria, and contains about 800 cuerdas of land, that is to say, about $777^{15}/_{100}$ acres. The tract known as El Corredor was and is enclosed by a fence. On and for some time prior to, and for a short while after, March 20, 1953, this fence was an ordinary wire fence, not new and not in a good state of repair. Its condition was such that cattle with

7. To what extent such elimination actually resulted may not be understandingly found. It is not clearly established. But it must necessarily have been extensive, and may well have been total.

8. Although, let it be understood, no finding is made that such relocation attained any exactly defined proportions. The evidence does not extend that far. But it does show that, in consequence of the acquisition and use of lands by the United States, there was a relocation of a substantial portion of the island's population in newly provided homes on Vieques.

9. Thus, before the condemnation proceedings.

some frequency escaped from the enclosure through it. It is now fenced with a modern and wholly adequate fence, which was constructed at a cost of about $30,000 in 1954 or 1955.

■ On August 12, 1952, the commandant of the Tenth Naval District, with headquarters at San Juan, Puerto Rico, within whose district Vieques was and is located, transmitted by United States mail to each of the persons registered as owning cattle being grazed on navy land in Vieques, a form letter in this language:

> "Headquarters
> Tenth Naval District
> San Juan, Puerto Rico
> "NDIO:42:DE–210:ala
> Ser 3191
> 12 August 1952

"Dear Sir:

"The practice of grazing cattle on property belonging to the United States of America in the area generally known as the Maneuver Area in Vieques, Puerto Rico, constitutes illegal trespassing on government property and must be discontinued on or before 1 September 1952.

"This property will be required for maneuver purposes after that date. Accordingly, all trespassers are hereby notified that the United States Government assumes no responsibility for loss, injury or death to persons or animals within United States Government lands (Maneuver Area), to be used for maneuvers after 1 September 1952.

> "Very truly yours,
> /ss/ M. R. Greer
> M. R. Greer
> Rear Admiral, U.S.N.
> Commandant Tenth Naval District"

Among the persons there registered as owning cattle being grazed on navy land in Vieques was Maria Soto de Legrand, one of the plaintiffs herein, *vide infra*. A signed original of the foregoing letter was transmitted to her by United States mail. Of the original signed letters thus transmitted, some were not delivered to the addressees and were returned to the transmitting office. That transmitting office made and preserved a list of the addressees of the letter, whose drafts of the letter were thus returned, which list is in evidence herein. The name of Maria Soto de Legrand is not on that list of addressees to whom delivery of the letter was not actually made. The court, accordingly, finds that the letter was timely delivered to Maria Soto de Legrand. There is no evidence that any copy of the letter was delivered either to plaintiff Miguel Angel Legrand or to Jesus Legrand Soto, neither of whom, however, was a registered owner of any cattle being pastured on navy land.

On March 20, 1953, the defendant, under the auspices of the United States Navy, was conducting maneuvers on the island of Vieques. In such maneuvers various types of explosives were employed. Upon this subject, in the course of the trial of this litigation, the plaintiffs introduced, and the court received, in evidence, certain interrogatories by the plaintiffs propounded to the defendant, and the defendant's answers thereto, of which the presently relevant questions and answers are set out in a footnote.[10] Without needless repetition, it may be understood that, at this point in this memorandum, the court adopts the answers thus given with due correlation with the several questions to which they are respectively responsive; and finds

---

10. From the interrogatories and answers mentioned, the following are quoted:
 *Questions Nos. 1 and 2*
 "1—On what date or dates did the United States Navy conduct maneuvers in the Island of Vieques during the latter part of 1952 and January, February and March, 1953?

 "2—State, expressing dates, the duration of each of said maneuvers."
 *Answer to Questions Nos. 1 and 2*
 "1 and 2. The following maneuvers were conducted on the Island of Vieques during the period in question:
 TRAEX 11–53 23 August 1952–15 November 1952
 TRAEX 111–53 28 January 1953– 24 February 1953

that the facts set out in such answers, thus understood, are true.

Among the persons residing in the Moscou settlement on, and for an unestablished interval before, March 20, 1953,

were plaintiffs Maria Soto de Legrand and Miguel Angel Legrand, and one Jesus Legrand Soto. They resided in the same home after the fashion of a family. Maria Soto de Legrand was then a wid-

> TRAEX IV–53 3 March 1953–16 April 1953
> (Phase 1)
> PHIBEX 11–53 27 February 1953– (Arrived Vieques)
> (Phase 1) –2 March 1953 "

*Question No. 3*
"3—Were there any maneuvers going on or being conducted on March 20, 1953?"

*Answer to Question No. 3*
"3—Yes—TRAEX IV–53."

*Question No. 4*
"4—If not, on what date prior to March 20, 1953 had terminated the last maneuvers prior to that date?"

*Answer to Question No. 4*
"4—(See answer to 3d interrogatory)"

*Question No. 5*
"5—Were any explosives used during any of the maneuvers to which interrogatories No. 1 and No. 2 refer?"

*Answer to question No. 5*
"5—Yes"

*Question No. 6*
"6—State what explosives were used, describing each."

*Answer to Question No. 6*
"6—Many different types of explosives were used during the maneuvers referred to in answers to the 1st and 2d interrogatories and on different portions of the "Maneuver" and "Impact" areas on Vieques. The following is a list of some of the various types of explosives used:
"Aircraft Bombs—100, 500, 1000 lb. General Purpose High Explosive; Mapalm (with Igniters)
"Rockets—5 inch Spin-stablized Rocket (SSR), Hyper velocity aircraft Rocket (HVAR), Aircraft Rocket (AR); 2.36 inch Rocket—High Explosive Anti-Tank (HEAT); 3.5 inch Rocket—High Explosive Anti-Tank (HEAT)
"Projectiles and shells—5"/38 Common and Anti-Aircraft Common; 105mm, 90mm, 75mm, 40mm, 20mm, 4.2", 81mm, 60mm Mortars.
"Grenades (Hand and Rifle)— Fragmentation; Energa (HEAT); HEAT:AT: Illuminating; Incendiary; Smoke; White *Phosphrus*."

*Question No. 10*
"10—What is the area in Vieques known as 'Maneuver Area'?"

*Answer to Question No. 10*
"10—Maneuver Areas, Vieques (as of March, 1953): That portion of the Island of Vieques bounded on the west by the western boundary U. S. Navy property excluding the Santa Maria area and the Dairy Cattle Sanctuary in the same vicinity being more particularly described as follows:
Beginning at a point on the west side of Cayo Berdiales approximately at coordinate 4103 NAN 3; thence following the western boundary of the U. S. Navy property to 4307 VICTOR 3; thence to coordinate 4307 UNCLE 1; thence to coordinate 4207 EASY 2; thence to coordinate 4307 OBOE 2; thence north along grid line 44 from latter point to paved road at coordinate 4308 EASY 4; thence northwest along paved road to bend in road at coordinate 4309 NAN 3; thence to coast; thence easterly along coast line to a line joining coordinates 4909 NAN 3 and 4905 ROGER 2, which line forms the eastern boundary of the Maneuver area; thence westerly along the south short line of Vieques to the point of beginning."

*Question No. 11*
"11—What is the area in Vieques known as 'Impact Area'?"

*Answer to Question No. 11*
"11—Impact Area, Vieques (as of March, 1953); That portion of the Island bounded on the west by the eastern boundary of the maneuver area (stated above), and extending east to grid line 60, thus excluding the PUNTA ESTA Lighthouse."

*Question No. 12*
"12—What is the use to which each of said areas was dedicated by The Navy during the latter part of 1952 and January, February and March 1953?"

*Answer to Question No. 12*
"12—Both areas were used for the maneuvers referred to in answers to the 1st and 2d interrogatories."

ow, and was the mother of Miguel Angel Legrand and Jesus Legrand Soto. On March 20, 1953, Miguel Angel Legrand was thirty-one years of age, and Jesus Legrand Soto, born February 5, 1940, was thirteen years, one month, fifteen days of age, and a student in the local common, or grade, school.

On March 20, 1953, Maria Soto de Legrand owned, and for several years theretofore she had owned, a cow which was kept by her as a domestic animal producing milk potable by human beings. The animal was maintained as an incident to the Soto-Legrand household. She was one of the cows that were then being pastured, supra, on the land of the United States in Vieques. With other cows, she was then supposed to be grazed during maneuver intervals in the area known as El Corredor. But at that time the fence or fences enclosing El Corredor was or were in a poor and inadequate state of repair, supra. And some of the cows supposed to be restrained in El Corredor occasionally passed, through inadequate segments of fence, into lands beyond the enclosure, and among other lands, an area known as La Hueca, infra.

On and for some time prior to March 20, 1953, it was the practice of Miguel Angel Legrand and Jesus Legrand Soto, or either of them, in the evenings to walk to El Corredor or its vicinity to locate and drive, or otherwise take, to their home the family cow. Although the evidence is not clear upon this point, it is probable that they, or one of them, also brought the cow to the pasture area on mornings. At any rate, one or both of them regularly located and got the cow at each pasture day's end.

Other people on the island also came regularly to the pasture area during evenings to take their cattle to their homes.

Towards evening, and between 4:30 and 5:30 o'clock P.M.,[11] on March 20, 1953, Miguel Angel Legrand and Jesus Legrand Soto were seeking the family cow. They were accompanied by Luis Campos Encarnacion and Francisco Santiago, each then about eighteen years of age. All four of them were walking as a group in the general neighborhood of, and relatively close to, each other. They had entered into an area to which is attributed the name "La Hueca," in which they were hunting the cow. It is in the general neighborhood, but not a part, of El Corredor. It, too, was fenced with wire fencing. But that fencing was also old and not adequately maintained. There were intervals in that fence within which the fence was inadequate either to confine cows or to require any substantial effort for entrance into the area by men.

On March 20, 1953, a gate was maintained in at least one place in the fence mentioned in the last preceding paragraph through which entrance into or exit from the enclosure might be had. And on the fence line near that gate was a large sign, with a vertical central dividing line, of which, on the left side in English and on the right side in Spanish, was printed, in capital letters of sizes diminishing from top to bottom, this notice or warning:

Danger
U.S. Government
Property
No Trespassing
Trespasser Will Be
Prosecuted To The
Full Extent Of The
Law. Admittance Only
To Authorized Personnel.

Other signs, essentially identical, were placed elsewhere along the fence, as well as on the margins of other areas of the island. The number of such signs thus posted is not shown with assurance sufficient for a finding thereof. Also posted along the roadways of the island—but exactly where or in what number may

---

11. The exact hour may not be found with assurance. It is variously stated in the evidence, and no more precise identification of it may be made.

not be determined—were signs bearing this warning:

Live Firing In
Progress Keep Out

— — — — — —

Tirando En Progreso
Peligro Fueda

■ While, in discovery proceedings, Miguel Angel Legrand has to be understood as denying his observation of such signs, as a witness on the trial he acknowledged seeing a sign before March 20, 1953, substantially identical with the one first above described on the fence surrounding El Corredor, and near to the gate giving entrance to it. And the court finds that both he and Jesus Legrand Soto, each of whom had always theretofore resided upon the little island of Vieques had, frequently before March 20, 1953, seen not only signs identical with the one first above described but also warning signs identical with the one set out immediately thereafter, supra.

Moreover, all four of the companions, Miguel Angel Legrand, Jesus Legrand Soto, Luis Campos Encarnacion and Francisco Santiago, then knew that at that precise time maneuvers were in progress on the island. They did not, however, know with assurance and precision the exact boundaries of the then currently employed maneuver areas.

In February, 1953, therefore, during the month immediately before the explosion and their injury, Miguel Angel Legrand and Jesus Legrand Soto were taken into custody by members of the Military Police Force operating on the island of Vieques. They were brought to the police headquarters for the island. There the Legrand brothers were informed by the police authorities that their apprehension had been effected because they had been entering without right or permission upon the naval res-

ervation on the island; and they were warned that they were not allowed to, and thereafter must not, enter upon the reservation area at all. Special admonition in that behalf was given to Miguel Angel Legrand as the senior of the brothers, who was also charged to maintain a watch over obedience to the caution by his junior brothers. Thus cautioned, they were released and were not then formally punished. But thereby the immunity to intrusion by them of the island's naval reservation areas was personally and expressly brought home to them. That action was taken not only as against the Legrand brothers, but also with respect to other boys and young men, including Francisco Santiago.

In entering the area thus mentioned, the four youths had not been admitted by naval, or other official, personnel, and had not gone through any gate but had rather, and purposefully, entered by going through or over a portion of the fence which was in a condition of disrepair. That was a practice which Miguel Angel Legrand and Jesus Legrand Soto had regularly followed. And, doing it, they had customarily chosen times for entrance when no patrol, or other navy, personnel were present or in a position to observe their entry.

The four companions were walking along an ordinary roadway. At the precise moment now about to be mentioned, they were proceeding at intervals of from six to eight feet from each other in what is loosely described in the oral evidence as a semicircular formation, and in the following sequence: first, Luis Campos Encarnacion; second, Francisco Santiago; third, Jesus Legrand Soto, and lastly, Miguel Angel Legrand. Thus proceeding, Jesus Legrand Soto digressed from his course sufficiently to, and did, kick an object lying by the roadway.[12] For want of evidence

12. The court makes this finding abundantly aware that both in his answers to pretrial interrogatories and as a witness upon the trial, Miguel Angel Legrand may be considered to have denied that Jesus Legrand Soto kicked the object. He certainly is to be understood as denying that he saw such kicking. But the finding is believed to be quite consistent with the records and pleadings herein. A discussion of this branch of the case is offered in the course of the court's announcement of its conclusions of law, *infra*.

adequate for an informed finding in the matter, the court does not find or determine whether at that time and place Jesus Legrand Soto deliberately kicked the object, or kicked it vagrantly, or casually, or even inadvertently, or merely stepped upon it as he walked over its location. But, however it was applied, the contact of his foot with the object was such, in weight, force and violence, as to have the qualities of a kick. He imposed a substantial external force upon the object.

At the time of its kicking, the object just mentioned exploded. The explosion was violent and its results unfortunate and distressing. All four of the companions were precipitated to the ground and severely injured as a direct result of it. After the explosion and because of his injuries sustained therefrom, Francisco Santiago underwent medical treatments for about two months, and Luis Campos Encarnacion for more than two years. The precise nature of their injuries was not shown, and is not now found. Those two men are not parties to this suit.

As a direct result of the explosion, Jesus Legrand Soto was so seriously injured that he was promptly taken first to a local marine hospital, and the next morning to Rodriguez Hospital, San Juan, Puerto Rico, where, on March 21, 1953, the day after the explosion, he died in consequence of the injuries thus received by him.

Also as a direct result of the explosion, Miguel Angel Legrand was promptly taken, first to the foregoing local marine hospital, and the next morning to Rodriguez Hospital, San Juan, Puerto Rico, where he remained under treatment for twenty-two days, after which he was taken to the District Hospital at Fajardo, Puerto Rico, where he was treated for about nine months, and to which, after an interlude of release, he later returned for care during several more months. He underwent, in consequence of his injury, four surgical operations on his right arm and four other surgical operations on his left leg, and, over substan-

tial periods of time, wore casts upon those members. Moreover, as a result of the injury mentioned, he encountered, and still has, a substantial impairment, both in the range of motion and in the strength, of both his right arm and his left leg. Both of those members carry disfiguring residual scars. And he still experiences pain in his left leg when he walks. Throughout his treatments, he experienced conscious pain and suffering, the exact particulars respecting which, for want of pertinent testimony, may not be understandingly defined. As a result of his injury thus encountered, he was unable to work from March 20, 1953, until some time in March, 1957. He is still unable to do heavy work. But he is now engaged in clerical work as an employee of another person in St. Thomas, Virgin Islands, where he has resided since some time in 1955. His present earnings are not shown by the evidence. Before his injury he worked some of the time on pineapple farms for $2.16 per day, and part of the time as a sugar cane worker at an elastic wage of $3 per day or more, depending on the varying price from time to time of sugar in the market. The evidence does not disclose either the actual figures at which such wages were paid for sugar cane work, or even the extremes within which they fluctuated. Nor does it establish how regularly he worked, or with what degree of consistency he was employed for wages, before March 20, 1953.

Prior to March 20, 1953, Jesus Legrand Soto was not employed as a wage earner. He had to that time continued to attend school.

No showing is made to the effect that Miguel Angel Legrand had paid, or even incurred expense on account of, or been charged for, medical, surgical, hospital or nursing services or treatment. In fact, a negative inference is left upon that question. Similarly, no proof was made of like expense for treatment, during the brief period of his survival, of Jesus Legrand Soto, or for his funeral and burial.

The object so kicked by Jesus Legrand Soto was an explosive shell. There is no direct evidence as to how it came to be in the place where it was lying and exploded. But, upon the evidence touching the use for which the defendant acquired so large a portion of the island of Vieques and to which upon its acquisition it was put, and also the unquestioned use of designated areas of the taken lands for military maneuvers from August 23, 1952 through November 15, 1952 and from January 28, 1953, through April 16, 1953 (less only the interval from February 24, 1953, to February 27, 1953), and the employment during such maneuvers of explosives of the kinds described in defendant's answer to question No. 6, footnote 10, supra, the court finds that the device which exploded came to be in the place where it was lying and exploded by being propelled into or placed in that position by the defendant in the course of such maneuvers.[13] Exactly how it was so propelled or placed is not, and may not from the evidence be, determined or found. It is not, nor for want of evidence may it be, found when such object was put into the position it occupied at the time of its explosion, or by what person or persons it was put into such position. And, despite the allegations of the complaint in that behalf, the court does not find that it was *left or abandoned* in such place in any proper significance of the term "left or abandoned." The maneuvers just mentioned were then, and for some weeks both theretofore and thereafter were, and continued to be, in active progress. Hence, the normal time, following the maneuvers, for the removal of explosives from the premises by men detailed to disposal operations had not yet arrived. It follows that, not having been *left or abandoned* at all, it was not, either *negligently or wrongfully so left or abandoned.*

13. The finding thus announced should be understood as a deduction of fact from evidence that reasonably supports it rather than a finding supported by direct and positive evidence of the device's actual placement. It will thus be understood that the court does not, indeed can not, declare whether the device was hurtled into the position it occupied at the time of the explosion by some propulsive force, or was carried to and placed in such position.

In their entry into, and presence in, the area where the explosion occurred, Miguel Angel Legrand, Jesus Legrand Soto, Luis Campos Encarnacion and Francisco Santiago were acting in violation of conspicuous warning and orders of or given by authority of the defendant, and were trespassers upon the premises of the defendant. But, even if it be considered that the defendant, through its naval personnel and peace officers, had, by silence, tolerated their coming into such area to locate and take home the cow of Maria Soto de Legrand, and had accorded a like tolerance to others similarly circumstanced, they were, at best, mere licensees.

■ The defendant was not guilty of negligence in any manner, respect or particular related to the presence of the explosive object at the place where, and time when, it exploded. That object was not then or there so located as a proximate result of any negligence on the part of defendant, or on the part of any one acting in its behalf or for it.

■ Jesus Legrand Soto was negligent and reckless in his kicking of the explosive object. Such negligence and recklessness was the proximate cause of the explosion of the object, and of the injuries and damages therefrom resulting.

Jurisdiction unquestionably exists in this court over this action by virtue of Title 28 U.S.C. § 1346(b). Insofar as any issue touching such jurisdiction might be involved, it would be determinable under the law of the United States.

But the jurisdiction granted by Title 28 U.S.C. § 1346(b) is explicitly limited to

"civil actions on claims against the United States, for money damages, accruing on and after January 1,

1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."* (Emphasis added.)

Whether, under the facts as they are determined to exist, supra, a private person occupying the position of the United States in relation to those facts would be liable to the several claimants is, therefore, by the express mandate of the statute itself, to be determined by the domestic law of the Commonwealth of Puerto Rico.

Among the findings of fact already announced is one to the effect that Jesus Legrand Soto, as the four young men were walking through the area in which the explosion occurred, digressed from his course sufficiently to, and did, kick the object which exploded, and whose explosion gave rise to the injuries resulting in his death, and also to the injuries on account of which Miguel Angel Legrand makes claim. In footnote 12 it is observed that a discussion of that finding is offered in this memorandum. That discussion is now advanced. The court is fully mindful that the burden of proof supportive of such a finding rests upon the defendant. It is also aware that no witness testified that Jesus Legrand Soto was personally seen by such witness to kick the object, and that Miguel Angel Legrand, both in answer to a pretrial interrogatory and as a witness upon the trial, in practical effect denied that the kicking occurred. But there is more in the present record on that factual problem. Paragraph 2 of the complaint of the plaintiffs in this action is couched in this language:

"On an occasion *prior to March 3, 1953,* the exact date being unknown to plaintiffs, *employees of the defendant, while acting within the scope of their employment, negligently and wrongfully left and abandoned* on lands within the United States Navy Reservation, in Vieques, Puerto Rico, *an explosive contrivance or device* the exact nature of which is unknown to plaintiffs at this time, *which exploded upon being accidentally kicked by the said Jesus Legrand Soto while he was walking on said lands accompanied by co-plaintiff Miguel Angel Legrand."* (Selective emphasis added.)

The complaint containing the emphasized concluding language of that paragraph was prepared by plaintiffs' counsel, and, in behalf of both plaintiffs, was signed by a responsible and able member of such counsel in the name of all of them. The court considers the quoted and emphasized language to have been used understandingly and deliberately, not vagrantly or inadvertently.

That allegation may be regarded either as a formal admission for the purpose of this action, and as such binding and conclusive throughout the case upon those in whose behalf it was made; or as an evidentiary declaration. And, even considered in the latter and less absolute fashion, it is highly significant. It is to be understood as the reflection by plaintiffs' counsel of the factual setting of the misadventure in suit, which had been disclosed to their counsel by or in behalf of the plaintiffs. It is a purposeful assertion by plaintiffs of an ingredient of the claims in substantial sums which in this action they made against the defendant. They are not thought to have made the assertion lightly or without supporting historical background. The court has already adverted to the testimony upon the trial by plaintiff, Miguel Angel Legrand, which the court treats as a denial in substance and effect that Jesus Legrand Soto kicked the explosive object. That was its patent thrust. Yet, the evidence itself as given was not quite that direct or unequivocal. It was elicited on cross examination, and by separate and somewhat disconnected

questions. He first said in substance that he did not himself step on the explosive object, and that he did not see any other one of the four youths in the party step on it. Later in his cross examination, the subject was reached again. Describing then the incident of the explosion, he said that as the four companions walked there they were fairly close together, with Luis Campos Encarnacion leading them, Francisco Santiago following next, and Miguel Angel Legrand coming last (manifestly, it results that the third in order was Jesus Legrand Soto); that they were spread out in a kind of semicircle; that while he could see Luis Campos Encarnacion all the time, some times he looked in the other direction; that, at the time of the explosion, the witness was looking in the other direction from Luis Campos Encarnacion (which was also the direction of Jesus Legrand Soto); that he saw nothing but only heard the explosion. That testimony, by the court fully heard and understood, while it disclaims any affirmative knowledge that Jesus Legrand Soto kicked the object, really proceeds to the point where it discloses that the witness did not actually see all that was done by the several other members of the group immediately before, and in the instant of, the explosion. Nor is the answer of Miguel Angel Legrand to a relevant interrogatory more positive. He was asked this question numbered 5:

"Please state whether or not you saw or became aware of the presence of the alleged explosive contrivance or device before Jesus Legrand Soto kicked it."

To that question, he made this answer:

"I did not see nor were aware of the presence of the explosive. Neither I saw that Jesus kicked the device."

Again, the response, insofar as it touches the subject of kicking, is somewhat less than categorical. On the whole record, the court considers that the plaintiffs' own allegations in their complaint touching the kicking of the explosive device has not been nullified by the evidence. And it is to be remembered that it is their allegation, not one made in the first instance by the defendant.

It will have been observed that the court has found the area where the four youths were walking immediately before, and at the time of, the explosion to have been that described as La Hueca. Not all of the evidence is precise in that identification of the area. But some of it is. The site will be understood to be located in the general neighborhood of, but not actually within, El Corredor and also only a short distance, and within easy walking range, from Moscou in which the Legrands resided, and the neighboring Santa Maria.

 Brief mention is made at this point of defendant's allegation to the effect that "the accident * * * was fortuitous for which the defendant may not be held liable." Presumably, it intended thereby to tender the defense sometimes characterized as "inevitable accident." Upon that point, it need be said only that the court does not consider that the facts make that defense applicable. Upon the proofs, the question which primarily emerged was whether the defendant was guilty of negligence proximately causing the explosion, and the injuries and damages resulting therefrom. Upon that issue the burden or proof rested on the plaintiffs. If it were found by the court that the defendant was negligent and also that its negligence was the proximate cause of the explosion, then, the issue of contributory negligence would have arisen, upon which the burden of proof would have rested on the defendant. But the explosion with which the court is concerned was not fortuitous in the legal sense.

The court recognizes that, under the decisions of the Supreme Court of Puerto Rico, the owner of real property who negligently equips, maintains or operates it, and whose negligence proximately causes injury to a person lawfully upon such property, whose presence thereon should reasonably be expected by the owner, is generally liable for any lawful

damages resulting from such injury. It recognizes also that special care must be taken by an owner of such premises for the safety of children who are of tender years or immature understanding, who lawfully come, and may reasonably be expected to come, upon such premises; and that in appraising, as negligent *vel non*, the conduct of a child, such child is judged, in the matter of foresight and care, not by the standard of a prudent adult but rather according to the tests proper for children of his or her own age, intelligence and experience.

Reference is now made to Irizarry v. People, 75 P.R.R. 740, in which the court affirmed, but with an increase in the allowance, a judgment awarding damages for personal injuries to an eight year old boy who was hurt by the explosion of a cartridge which he had found on a roadside where it had been negligently left by employees of defendant engaged in road improvement work; to Figueroa v. American Railroad Company, 64 P.R.R. 320, wherein the court affirmed a judgment for the death of a child two years eleven months old, who was killed by a train passing on a track located within three feet from the front porch of the child's house; to Ramos v. Sucesion J. Serralles, 51 P.R.R. 332, reversing judgment of dismissal, and ordering the entry of judgment for $2,500 in favor of the mother of a daughter three and one-half years old, killed by the impact of sugar cane cars drawn by oxen along tracks in an alley in a thickly settled community, where the presence of children of tender years was regularly to be expected; to Rivera v. Porto Rico Drug Company, 32 P.R.R. 470, in which a judgment for defendant was reversed, where the plaintiff was a small boy, the son of a female employee of defendant, the manufacturer and vendor of ice cream and beverages, and the plaintiff child had been allowed both by his mother and, though reluctantly, by the defendant to be upon the premises of defendant and, rather regularly, to do minor jobs for defendant, being paid in merchandise of the defendant not apt for sale to custom-

ers, but attractive to a child, and on one occasion, when thus on the premises of defendant, went too near to an electric motor and was injured when the moving machinery engaged some of his clothing.

Yet, the law of the Commonwealth, even when children are involved and injured upon the premises of a defendant, does not hesitate to administer the tests of liability proper in cases where an injured person, though a child, is a trespasser or a mere licensee upon the premises where he is hurt. Thus, in Berrios v. Barau, 46 P.R.R. 773, the court refused to apply the so-called "attractive nuisance" doctrine in support of the claim of a child who was injured by moving machinery, when he ran from his own house into a bakery, which had a patio in common with his home, and ran against the bakery's machinery, where the bakery manufacturing area was not customarily visited by children, and children were neither expressly nor tacitly invited to its premises. In Varela v. Fuentes, 70 P.R.R. 838, the court affirmed the dismissal of a suit by a boy for damages from the severance of his arm. The boy, eleven years of age, had sustained the injury when he attempted to clear refuse from the sickle of a mower while it was in operation. The boy claimed that he made the attempt at the request of the defendant owner of the mower. The court found that the defendant had not told plaintiff to do the act. It would appear inevitable, however, that defendant, personally present, was aware that the act was being attempted. Diaz v. Central Lafayette, 66 P.R.R. 780, arose when defendant, with a locomotive and fifteen cars, was transporting cut sugar cane, and a nine year old boy approached one of the cars and attempted to obtain a piece of cane, was dragged along beside the car, fell on the track and was killed. Judgment for defendant was affirmed. In reasoning to its conclusion, the Supreme Court, despite the acknowledged attraction to a small boy of a moving load of seductive cane, declined to apply the attractive nuisance doctrine to injuries resulting from contact with a moving ve-

hicle, which is its own warning of danger. The court appears to have been moved to its course in some part out of consideration of the economic burdens which suits of that character, if successful, would impose upon the use of property. In Fantoja v. American Railroad Company of Porto Rico, 45 P.R.R. 534, the Supreme Court, on the ground that the plaintiff was a trespasser, affirmed the dismissal of an action for the death of a child killed by a train while grazing a goat on railroad property. In the syllabus, it is said that:

"Where a child is involved the courts must be more careful than in the case of an adult; they must be more exacting with the defendant, and they should consider the lesser development of the intelligence of the child, both as to the commission of the trespass and as to his ability to guard himself from danger; but this does not mean that the mere fact that he is a child precludes his being considered a trespasser in certain cases."

Out of the foregoing cases, and others arising within the Commonwealth courts to which the attention of this court has been directed by counsel, emerges the conclusion (having present relevance first, and to some extent only to the claim of plaintiff, Maria Soto de Legrand, on account of the death of Jesus Legrand Soto) that the courts of Puerto Rico, in actions for damages from personal injuries arising out of the ownership and operation of real property or machinery, where the injured person is a child of tender years, impose upon the owner defendant the duty to exercise care for the safety of children commensurate with the positions in which such children are placed, and their ages, experience and intelligence. By that standard, an owner defendant may be held to be negligent in the instance of injury on his premises to a child of tender years, even though he would not be considered negligent at the suit of an injured adult of normal experience and intelligence. And in that connection, a limited application is made of the attractive nuisance doctrine to the extent of its contribution to the measurement of alleged negligence. But those courts do not, in their rulings, lose sight either of the proper prerogatives of the ownership of property or of the status, as trespassers, or bare licensees, or invitees, and the like, of persons who go upon the premises of others, or of the measure of care to which such persons are entitled at the hands of the owner of premises into which they enter. Similarly, in considering the charge of negligence against one injured on such premises, the Commonwealth courts give due consideration to the age, experience and intelligence of the injured person, and hold him to a standard of due care appropriate for one of his own age, experience and intelligence, meanwhile requiring a higher measure of care from an experienced and normal adult. Conforming to that standard, he is held to be free from negligence; falling short of it, to be negligent. And, in testing for negligence, whether of the owner defendant or of the injured person, account is taken of the character of the known use of the premises on which injury occurs.

Observing the standards accepted within the Commonwealth, this court concludes, as it has already declared, that the defendant was not negligent in respect of the condition of the premises, inclusive of the explosive device thereon, within which the explosion occurred. The premises were being used by it for the purpose for which it had so largely acquired the land of Vieques. That purpose was familiarly known by the island's inhabitants, including Miguel Angel Legrand and Jesus Legrand Soto. Such use necessarily involved the employment of explosives of several kinds and of varying violence. The maneuvers herein mentioned were, and for some time thereafter continued to be, in active operation and progress. Indeed, with only slight intermission, they had been under way for more than two months and, for much the greater part of seven months before the explosion.

The danger incident to intrusion into the navy reservation was known to the people of Vieques, including Miguel Angel Legrand and Jesus Legrand Soto. By means of warning sign boards and the presence of patrolling policemen, emphasis had been placed upon such danger. Only recently before the incident of March 20, 1953, those policemen had personally brought it home to Miguel Angel Legrand and Jesus Legrand Soto, supra. The time for a post maneuver clearing of explosive objects from the area had not yet arrived, for the maneuvers had not been concluded.

In all of the circumstances that existed, the defendant had acted with due care, regard being had to the purpose for which it had acquired and owned, held and used the area. And it was not negligent in that behalf. That was true as between Jesus Legrand Soto and the defendant. It is true that he was a minor. But, in no valid sense of the expression, was he a child of tender years. He was a boy slightly more than thirteen years of age, born and reared on the island, and inevitably acquainted with its terrain. He knew of the presence and mission of the naval establishment, and of the use of the naval reservation. He was aware of the comparative regularity and frequency of the use on the reservation of explosives. Inevitably, at his age, he was mindful of the peril to human safety which lurks in the presence of explosive shells and devices, and of the practical necessity of care by anyone who is in their vicinity. He was old and mature enough to be the companion, on exploratory walks, of the two other youths in the party, and his adult brother. It is difficult to perceive what care for his safety, short of his apprehension and confinement, the defendant might, with reasonable diligence have taken, beyond that which it took. All that is said with full awareness of the natural curiosity of an adolescent youth. But his very curiosity, though it may tempt him to venture into hazardous places, also serves to inform him of the dangers which he is incurring.

And, of course, the situation is even clearer with Miguel Angel Legrand, thirty-one years old, a lifelong resident of Vieques, who inevitably knew well every part of the small island, and the necessity of exercising due care under the existing circumstances for his safety.

From the want both of negligence on the part of defendant and of the proximate causation of the explosion by such negligence, it follows, without more, that the basis of the plaintiffs' claims has failed of proof. And that is true irrespective of the defendant's averment of negligence and contributory negligence on the part of Jesus Legrand Soto and Miguel Angel Legrand.

Yet, because those issues have been tendered both in pleadings and by the proof, finding has been made touching them. As has already been set out, the court considers that negligence by Jesus Legrand Soto was the proximate cause of the explosion of the device. And that is equally the case whether he deliberately kicked the device, or merely carelessly and inattentively kicked, or stepped upon, it. In that light, his negligence was the proximate cause of the injuries sustained by each of the four youths, including himself, and of the damages resulting therefrom. And as to the claim of plaintiff Maria Soto de Legrand, which derives from Jesus Legrand Soto, it is also to be regarded as contributory negligence. But since the court has found no negligence by the defendant as the proximate cause of the explosion, the issue of contributory negligence, strictly so defined, is not reached.

At this point, appreciative and grateful mention is made of the citation, by counsel for the several parties, of reported opinions in many cases arising under the Federal Tort Claims Act on account of injuries sustained in various states within the Continental United States. All of those opinions, and others to which study of the case has led, have been carefully examined and analyzed by the court. The marked volumes containing them now rest on the table upon which the manuscript for this memoran-

**200**

dum is being written in longhand. The temptation to cite, quote from, and discuss them, some supporting this ruling, some admittedly advancing views that may be considered to question it, is readily acknowledged. But such a course, in the instant context, appears largely to be purposeless. Those opinions, in the main, rest heavily, as, by virtue of the language of the Act quoted herein, must be the case, upon the domestic law of the several states wherein the respective claims arose. And, to that extent, the opinions are not directly pertinent here; and for that reason many of them are obviously distinguishable from this litigation.

The court, for the reasons already discussed at length, concludes that judgment should be made and given herein, dismissing with prejudice this action in its entirety, and denying and dismissing with prejudice the separate claim of each plaintiff herein against the defendant, and taxing the costs of this action against the plaintiffs.

Judgment to that effect is, therefore, being made and given herein.